Okay, just let me, I don't want to start the clock yet. I just want to go over. So, all right, my understanding on this case, all right, so we have two people arguing right now, and then we're going to do the amici later. So, my understanding is you have a total of 15 minutes each side, but you're each giving five minutes on the amici argument that will occur at the end, correct? Yes, Your Honor. And on the amici argument at the end, that's going to be Ahmed for the ACLU and Stuart, which I believe is you, for the government, correct? Yes, Your Honor. All right. So, here you each have 10 minutes, and that the 10 minutes then would include your rebuttal time, too, as well. Yes, I would like to reserve two minutes for rebuttal. Okay. All right. Now we'll start the clock and state your appearance. And so you're, wait, you're only going to be talking about sort of the merits of the case, and then on the government, you know, the government paying for counsel and the right to counsel and all of those will be at the end because they go through all of the cases, correct?  All right. So, we won't ask you any questions about that. So, you can, you were probably worried about that because judges stray. So, we won't ask her any questions, right? We'll save those until the end. Okay. Go ahead, state your name and your appearance. May it please the Court, my name is Veronica Barba, and I represent Petitioner Victor Manuel Perez. I represented Mr. Perez before the Immigration Court, and I filed his petition for review. I would like to reserve two minutes of my time. Could you speak a little more clearly and closer to the mic? Yeah, a little closer. Your voice is a little light. You can move, try and move the microphones closer together so they're, yeah. Mr. Perez is a 24-year-old man who has a mental illness, has suffered severe sexual abuse, and has been institutionalized for most of his life. This Court should remand this case to the agency for it to properly analyze the record and correct its errors because Mr. Perez has suffered past persecution, and in Mexico, he will be unmedicated, exhibit erratic behavior, and be persecuted in an institution. Okay, so on his persecution part of it, he's got, undoubtedly, a lot of bad things have happened to your client. But the only thing that you have happening in Mexico was before he was two years old with his pregnant mother, correct? Yes, ma'am. So, my understanding of the law is even though bad things have happened to him in the United States, you can't use that to establish persecution in Mexico. Yes, Your Honor, but in this case, there was severe domestic violence to his mother, and this Court has found that past persecution to a family member can be attributed to a child. But up until when the mother was pregnant, so it's pretty hard to... This was before and after she had already had him, and they ended up having to flee to the United States. And in the case we cited, Mendoza Pablo V. Holder, that petitioner was three months old as well when he fled. Okay, but what's the evidence in the record that supports his claim that he was harmed to a similar extent by his father's abuse of his mother in Mexico? What's the evidence in the record here? Well, here we have her testimony, his mother's testimony. And in other cases, such as RUSAC v. Holder and Hernandez Ortiz v. Gonzalez, we have also used only testimony. In RUSAC, all we had was the testimony, and Mendoza Pablo V. Holder, all we had was the testimony of the petitioner as evidence. Here we actually have his mother testifying as to the fact that she was beaten, threatened with death, burned with cigarettes, cut with a knife, and locked in the house by Mr. Ortiz's father. And in Mendoza Pablo V. Holder, it does require that we show that the mother, where we tried to attribute harm from a mother to an infant child, that she was materially impeded to provide for the basic needs of her child and forced to flee an immediate threat of severe physical violence or death, which is exactly what happened here. She came to the United States though, so right? Right, because she was forced to flee an immediate threat of severe physical violence or death. I noticed there also in the record, it appears that Mr. Perez changed the descriptions of both his proposed social groups in his petition and before this court. So why should we review any new claims when they do not appear to have been raised or exhausted before the agency? Well, Your Honor, we feel that we have exhausted these issues. The purpose of the exhaustion agreement is to put the agency on notice of the contested issues. And in terms of the mental health argument, the immigration judge in her decision stated the delineation that we have now added, which is those who exhibit erratic behavior. That is different. And so if you're talking about putting someone on notice, it's when the first one, what was your first group? Persons with a serious and chronic mental illness. Okay, and so when that didn't work, then we said with erratic behavior, but that was right in the middle of the hearing, right? Well, Your Honor, the immigration judge actually brought that up in her decision. She was the one that referred to the case of Temu V. Holter, in which the particular social group is individuals with bipolar disorder who exhibit erratic behavior. And she actually did fact-finding on that issue. In matter of WIC and HOB, which I would like to point out was just issued by the BIA right before the answering brief was due in this case. The Board of Immigration Appeals stated that they were worried about additional fact-finding that would have to be done. And in this case, the immigration judge did state that she did not feel that Mr. Perez would exhibit erratic behavior. And so she made fact-finding on that issue in this case. I would like to also address Mr. Perez's well-founded fear of future persecution and point out that the BIA found that people with mental illness are not targeted in Mexico. And this is a finding that was not made by the immigration judge. She decided the issue on the erratic behavior. She stated that Mr. Perez would not exhibit erratic behavior and for that reason he would not be persecuted in Mexico. So it's unclear how the BIA came to that conclusion without conducting factual findings in their decision. Even if you have a good argument there, but if there's substantial evidence that supports the conclusion of the IJ, we're in a different position when we review that. So we're not able to pick how we would have decided it in the first instance. You have to tell us why it would compel that conclusion, right? Am I wrong or am I right? You're right, Your Honor. I could be wrong, but I think I'm right. I do think that our strongest argument is that the agency committed legal error in not considering the harm to the mother because this court's case law has shown that we should take that into consideration and harm to the family. But I do think that there was not substantial evidence to show that people with mental illness are not- Did the IJ not consider it or did the IJ say it didn't rise to the level of- You weren't stopped from putting that evidence on. The IJ just- It's different if you say, no, I'm not even going to listen to what you have to say. As opposed to, I heard it, but I don't think it rose to the level of persecution. Of course. So what happened here? Yeah, she did not make any of those statements. And actually, in her discussion of the particular social group, she does state that people, those with bipolar disorder who exhibit erratic behavior, those with mental illness, would have a well-founded fear of future persecution. She just does not find that Mr. Perez would have that because she doesn't think that he would exhibit erratic behavior in Mexico. So I don't think that she made a conclusion within her case, but there is an inference that there could have been a finding there. Because she raised it on her own. What suggests that she was wrong about the finding that you just referred to? That people with mental illness are not targeted in Mexico? No, no. There's an added twist here. It's not just people with mental illness. It's people with mental illness who exhibit erratic behaviors who are arguably at a greater risk because of the behaviors that they are engaging in. Ultimately, institutionalization under horrible conditions. Of course. What I'm making is the distinction between the Board of Immigration Appeals and the Immigration Judge. The Board of Immigration Appeals decided, although they adopted the decision of the Immigration Judge, decided to move on to stating that people with mental illness are not targeted, and then comparing this case to Mendoza-Alvarez v. Holder as opposed to the decision that the Immigration Judge had made. Do you want to save the balance for Rosetta? Thank you. Good morning. Good morning, Your Honor. May it please the Court. I'm Scott Stewart on behalf of the Acting Attorney General. In this case, the Board of Immigration Appeals upheld the denial of petitioner's applications for asylum, withholding of removal, and protection under the Convention Against Torture. The Board's decision was reasonable, and there is no basis for disturbing it. The petition for review should be denied. This Court should also reject petitioner's request for government-funded counsel, but I will save that for the amicus portion of the argument. Thank you, Your Honor. I'll start with asylum, Your Honor, since this is kind of the lengthiest and most extensive issue here. So Perez and the mother, I think, were found to credibly testify to violent abuse she endured while she was pregnant with him. Or, well, I guess I'm wondering, because I think she's citing Mendoza-Pablo v. Holder as her best case. So why don't you tell us why do we have to, since he was under two and part of the time pregnant, what did the IJ find and why is that supported? Sure, Your Honor. I think the key distinction here is that in Mendoza-Pablo, you had a situation where the child was, at the time in utero, during the significant portion of the abuse to the mother, and that affected, in turn, how the child proceeded thereafter in life. There was abuse to the pregnant mother, the petitioner. That abuse plainly harmed the child. It impeded the mother from, I believe, nursing, from caring for her child properly. The child was born prematurely and was malnourished. So you had some very direct and a very tight connection, perhaps in a sui generis kind of way in that case, given the mother's pregnancy that led to harm to the child that was just different in kind and different factually than this case. Here, Your Honor, you have a situation where the agency reasonably looked at the facts and said, look, this is not that kind of a case. We hear what the petitioner is saying factually, and we accept the credible testimony, but there's no evidence that the father, who would be the actor here, harmed the petitioner personally in Mexico. The petitioner has no memory of the time in Mexico. He was only one or two when he came to the United States. And the petitioner has not pointed to evidence that he was physically or emotionally affected by this abuse in Mexico. So I'd say those cluster of factors make this just factually different in kind, so it's not a Mendoza-Pablo type of situation, Judge Callahan. For those reasons, and because there is that absence of proof and difference in kind from Mendoza-Pablo, the agency here did reasonably conclude that the evidence did not compel the conclusion that the petitioner suffered past persecution. That's a starting point, Your Honor. Of course, the agencies here had alternative grounds and correct alternative grounds, Your Honor, to reject the asylum claim. Before I note that, I'll just briefly note that lack of past persecution also, as we've said in our brief, does away with the humanitarian asylum claim. The alternative grounds are the absence of a protected, a cognizable social group, of course, and the lack of a showing that petitioner would objectively and reasonably fears future persecution on account of any such social group. I'd like to take off a point where I believe Your Honor was focusing the exhaustion issue. The social groups here, Your Honor, are unexhausted and they are different in kind from the ones presented below. And exhaustion is this Court's decision in Barron at pages 678, 76 to 78, where they really emphasize the importance of exhaustion, that it's mandatory and critical. I want to emphasize that exhaustion is even more important in the particular social group context. In the BIA's decision, it's emphasized that the BIA repeatedly emphasizes that particular social group analysis is an inherently factual understanding that makes it critical for a petitioner to articulate this fine particularity and really delineate the group they're talking about. So exhaustion, you really need that presented effectively and clearly and cleanly to the agency so the agency can look at the facts and say, okay, you know, how is that viewed in society? Is that particular? Is it distinct? Does it meet the criteria? And we have the absence of that here and it makes a situation where this Court can't effectively review the newly articulated social groups. And with that, I'd also add that the new articulations are a concession of sorts that the agency was correct to recognize that as articulated, these groups do not meet the criteria for a cognizable social group. Victims of domestic violence are serious and chronic mental illness in Mexico. In addition to the exhaustion problems, Your Honor, these are large, undifferentiated, sorry, not undifferentiated, large groups with many folks with different conditions who may have different perceptions in society, may be more recognizable, that sort of thing. And I just emphasize, Your Honor, that in addition to all the points why these are not cognizable, I think it's really important to emphasize this Court's cases seem to, I think, support the idea that going in front of the agency is not a test run to try out a social group, say, okay, here's the problem with your social group, and then just tack on amendments when things show up here to try to correct those in order to get a remand. That's not a good incentive, and particularly in this case when you have the case law that supported sort of the addition of who exhibit erratic behavior. Timu was out and that could have been raised, and of course, you're right. Your adversary suggests that the IJ raised that on her own and dealt with it on the merits. So is that accurate? The immigration judge, Your Honor, certainly addressed Timu. The judge did so at page 72 of the administrative record, but it did so in showing that the actual group that the petitioner presented there, a petitioner represented by counsel, presented was not, as the Court put it, respondent's proposed group has no objective element that would render the group of persons with serious and chronic mental illness in Mexico socially distinctive or limited by particular cognizable boundaries. So it was different in kind than the Timu group. So your adversary suggested, though, that she discussed the add-on, who engage in erratic behavior. Is that accurate, that she discussed that on the merits and rejected it? I'm not certain of the answer to that question, Your Honor. I'd need to check that. But I do have another kind of thought on Timu about why it's just different in kind. There's no question that it's a significant addition and it changes the definition of the group in a material way. I'm just asking whether your adversary argues, well, okay, so we didn't raise it, but the IJ raised it and decided on the merits. I don't think that's right, Your Honor. Also, I'm going to say Timu was also different because it was not just serious and chronic mental illness. It was quite focused on folks who had bipolar disorder, which, as I recall, the Fourth Circuit emphasized that folks with bipolar disorder are a distinctive group. It's just intuitively, I would guess, of course, the record is not the record we have here, but intuitively bipolar disorder is just narrower and may present fewer of the kind of particularity issues that are presented by folks with severe and chronic mental illness. So I would just say that I don't think that the immigration judge kind of disposed of this particular group, and I think there's still the exhaustion problem. My recollection of these three cases, it's hard to keep them all in mind, was that the IJ here cited the, I think it was the Fourth Circuit case, for why there was a material difference between the general allegation of chronic and severe mental illness and one with a person who, as a result of that, tends to engage in erratic behavior. But did she actually reject on the merits that, assuming that she could consider it, that it was without merit? I don't think so, Your Honor. I think, and this is, the key paragraph is at page 72 of the IJ's decision that addresses TMU, and really I think it's more of a, look, here are the distinctions from TMU, which make this not a cognizable social group. So I don't think it was an affirmative ruling on the group that is now raised. And what about the, on the related CAT claim, what did the BIA say? The BIA's decision on this, Your Honor, was, this is page six of the administrative record, and basically the conclusion was, he just doesn't, there's not enough support in the record to support a likelihood of torture claim. I mean, here, I think we have a number of good reasons why the record supports that. First, we have the issue of no direct, even past, persecution to petitioner, putting aside maybe nexus issues than anything else. You just don't have the harm that would support an asylum claim or withholding a removal claim, and you certainly don't have the more severe forms of likely harm in the future that would support a convention against torture claim. I see that my time's almost up, and unless the Court has any questions, I would ask it to deny the brief. Did the BIA find it unexhausted? Because it wasn't raised before the IJ? The convention against torture claim, Your Honor? Yeah. The BIA did not do so, Your Honor, and I believe, I don't believe there was an exhaustion issue on the CAT claim, because that was, the CAT issue doesn't involve a particular social group, Your Honor, and the BIA, I'm sorry, the immigration judge at page 73 of the record did address and analyze the CAT claim. The BIA did so in turn, so there's not the same, you don't have the same issue there I think if you just don't have the particular social group needed, you just have the right to likely be tortured. If there are no additional questions, thank you. Thank you, Your Honor. All right, rebuttal. Hello, Your Honor. I would like to point out that in terms of the physical evidence that the government would like us to show regarding the past persecution to the child here, in Roussack v. Holder, and we have brought up Roussack v. Holder and Hernandez-Ortiz v. Gonzalez by this court in our briefing, the court has found that evidence linking abuses to parents, to their children, is not necessary. And also, in Hernandez-Ortiz, where there was no injury to the children in that case, and the children were not present when their father was beaten and their brother was killed after they left to a refugee camp, the courts found that injuries to the family must be considered. And in that case, there was also no physical injuries to those children, neither in Roussack v. Holder as well. And so I think the argument that just because there is no physical injury to Mr. Perez does not stand in accord with this court's case law. In the other cases, there was a joint declaration and other documentary evidence offered. Was that offered in your case? There was no joint declaration in this case, Your Honor. So it essentially is missing some evidence that would show that it was more likely than not. I'm using a shorthand, that bad things would happen to him, that he would be tortured. Well, Your Honor, this is not a torture case. We are trying to show that there is a reasonable possibility that he will be harmed, and so that creates the 10 percent chance here that we are trying to prove. All right. Thank you both for your argument in this matter. And I am going to ñ I do realize in these cases, I think we have at least three pro bono attorneys that are ñ and while we appreciate everyone that comes to court, I know that I speak on behalf of my colleagues. We do appreciate when people accept pro bono appointments because on difficult cases, it certainly assists us in the resolution of the cases. And we realize that people don't have to do it. So thank you to Ms. Barbara. And then I know in two subsequent cases, we have Ms. Alexander and I think also Monique Stoney as well. So I just want to ñ so in case I forget, I want to thank everyone that has participated in these series of cases and donated their time as pro bono lawyers. All right. This matter will ñ on this particular case, on the Petters case, is ñ well, I guess it will be submitted at the conclusion when we finish the amici part of it. So then the next case for argument is Isidro Carraso Gonzalez v. Matthew Whitaker, 17-70105. And on this, similarly, each side has ten minutes that we're going to argue right now. And for the petitioner, the ten minutes do include rebuttal time as well. And similarly, I would indicate that we'll ñ rather than dealing with the right to counsel and the reimbursement issues, we'll be dealing with the merits of each of the cases. All right. So good morning, and please state your appearance for the record. Thank you, Aurora. Good morning. My name is Angela Alexander. Okay. I think you're suffering from the same syndrome where it's ñ especially when we have video. Can you speak a little louder and maybe push those together so we can make sure we both record it but that everyone can hear? Certainly, Judge. And your outside voice, how's that? My name is Nancy Alexander, and I represent petitioner Isidro Carraso Gonzalez, who I assisted in filing this petition for review. I'd like to reserve two minutes of my time for rebuttal. We ask the court to remand proceedings to grant Mr. Carraso Gonzalez cat protection or withholding of removal relief. We do so because Mr. Carraso Gonzalez was diagnosed with schizophrenia spectrum disorder and PTSD and was tortured by police in Mexico when they kidnapped him, beat him, raped him, and cut off the tip of his thumb. I would like to talk to you today about two of the errors made below by the agency. First, the BIA erred in failing to consider Mr. Carraso Gonzalez's past torture as a principal factor in determining the likelihood of future torture as required by federal regulations and this court's case law in Nuru versus Gonzalez. Second, the BIA erred in broadly finding that the Mexican government does not have the specific intent to cause suffering to patients in its mental health care system. Well, let me ask you this, though. Some of the things in terms of, you know, keeping our standard of review in mind, I know one of the areas that you're going to argue about was he was kidnapped and your client claims that it was actually inflicted by the police or at least with some acquiescence rather than a but apparently the IJ didn't see it exactly the same way. So in instances, I think that there was some discussion in the record about your client said they were police officers that forcibly kidnapped him and committed other terrible acts upon him. The IJ seemed to say that, look at other things and say that people claim to be police officers when they are not in fact police officers and was not convinced that it was the police in that situation. What do we do with that? If there's two ways to look at it and we're not the fact finders, what do we do with that when we get up here? I think that's a clear error that the Board of Immigration Appeals failed to correct. And I don't necessarily agree that there are two ways to look at it. There can't be two ways because if there are two ways, it wouldn't compel finding it in your favor. But if there are two ways to look at it and the IJ and the fact finder looked at it a different way that supported by substantial evidence, our hands were tied, right, by the standard of review? So as your Honor says here, there's not two ways to look at this. The people who kidnapped Mr. Carrasco Gonzalez, they were in uniform. They put him into a patrol car. He thought that they were going to take him to the police station. They had badges. All of that evidence compels the conclusion that these were police officers. So even under the substantial evidence standard of review, I think this court has to find that they were police officers. But it strikes me that there's more than that. There's this joint declaration which discusses the risk of victimization by the police, the BIA. That was not discussed. And in that document, the joint declaration talks about the various approaches to prevention of torture and ill treatment and what goes on when people are arrested. And more specifically, when I'm looking at page 1015, it said that they visited detention facilities, including facilities in municipal jails, which are the first point of contact for persons held in violation of local and municipal laws and regulations. And all the institutions visited the delegation heard testimony from detainees who alleged that they had been subject to some type of physical and or psychological abuse by the police at the time of their arrest or at some time during their detention. In the case of one pre-charged detention facility in a particular state, the SPD reported that most of the detainees interviewed told delegation members that they had been subject to some kind of cruel, inhuman, or degrading treatment by the police. And doctors who examined many of the detainees documented injuries consistent with the allegations of those people. So there was evidence, specific evidence, that the police engaged in this kind of behavior and that evidence, which is described in the joint declaration, was not considered by the IJ or the BIA. Certainly, Your Honor, and I think that consideration is required by CAT regulations and neither the BIA or the immigration judge followed those regulations. And to Your Honor's point, in that same section, the expert declaration also assigns that individuals with psychosocial disabilities are at a higher risk of that detention by police officers and Mr. O'Rourke made sure as well that it was an individual at that time and at this time. This goes directly to the question of whether or not, out of thin air, they're saying that, well, even though he testified, and there's no adverse credibility finding here, that as you described it, they were police officers, they were justice police officers, it could have been other criminals who were impersonating police officers. Where they got this from, I don't know, this assumption that they made, but there's clear evidence in the record. What I'm suggesting is that they didn't consider it. They just didn't consider it and explain why they rejected evidence which clearly suggests misconduct by the police. Certainly, Your Honor, and not applying the CAT regulations, there's a legal error going to Your Honor's point at the beginning of what the standard of review here is. I would like to come back to... I think those are all friendly questions. I have a couple of less friendly questions. There's two cases that I want you to talk about. One is Villegas because the Villegas court did consider and reject evidence of harmful acts and practices such as long-term restraints and amputations. So I want you to distinguish your case from Villegas. And then also, there's a recent BIA decision, I think which happened after the briefing here, which is the matter of JGRP. It's a 2018 case in which the BIA rejected a claim nearly identical to Carrasco's. So I need you to tell me how this case is distinguishable. Certainly, Your Honor. First, to address Villegas, that case did not consider the types of evidence presented here, like the joint declaration that presents life-threatening conditions of confinement and policies meant to harm and punish people because of their symptoms of mental illness, and also that Villegas was published in 2008. Now we're in 2019. Mexico is well aware, the Mexican government is well aware of these practices, and yet over that period of time has failed to change. To Your Honor's question related to matter of JRGP, in that case, the BIA actually conducted a case-by-case analysis related to that particular petitioner. In this case, the BIA does not do that. Instead, they make a broad generalization that things like fact-finding the immigration judge made that intentional over-medication cannot give rise to specific intent to cause suffering. And that's the difference here between this case and matter of JRGP. Do you want to save the balance of your time for rebuttal? I would, Your Honor. Can I ask a question before? Are you familiar with NURU, N-U-R-U, versus Gonzales? Yes, Your Honor. And the standard there says if there was fast torture, and somebody who escaped to another country, likely he will be tortured again if returned to the site of his prior suffering, unless there have been changed country conditions. How does that apply to this case? I think the problem here, Your Honor, is that the BIA did not apply NURU to Mr. Caruso Gonzales' case. It did not look at fast torture as a principle factor, and instead summarily dismissed his claim that he will be tortured in the future. Instead, if the BIA were to have looked at the circumstances and conditions in Mexico now, as they apply to Mr. Caruso Gonzales, considering the joint declaration, the only conclusion that they can make from that is that he would also face torture in the future because he remains an individual with mental illness. All right. I'll give you a minute for rebuttal. We've used part of your rebuttal time, but I'll give you a minute. Thank you. Okay. I think we've kind of circumscribed the arguments to some extent, so there's several areas that you might want to target your comments to. I think we're familiar with the facts or the record. Sure, Your Honor. This case is a narrower case in the sense that we have withholding of removal and convention against torture issues. I'd start by saying substantial evidence supports the agency's conclusion here that the petitioner's proposed social group as presented to the agency is not cognizable. I don't think the panel has pressed too much on that, but I would just emphasize that, again, we have an exhaustion issue in this case, the individual with severe and chronic mental illness in Mexico who exhibits erratic behavior, is not the one presented below, not properly exhausted, as explained previously, and I'm happy to do a forum for purposes of this argument. Particular social groups are just critical to, given their inherently factual nature, to be articulated at the BIA. Therein, many BIA decisions teach the importance of that. Well, it seems like the BIA appears to acknowledge that the harm Caracas suffered when he was kidnapped may have risen to the level of torture, but the IJ didn't find that, right? That's right, Your Honor. All right, so in doing so, did the BIA make a finding of past torture, or if so, if the BIA failed to do that, what do we do? I think, Your Honor, on the torture issue, I don't think the BIA reached a square conclusion that there was past torture. What the BIA instead, I think, did was say, look, the inquiry here is whether there's a clear probability that the petitioner himself will be personally targeted for something that qualifies as torture, and I, the agency, conclude that no, that is not satisfied. The BIA did have some misgivings about the IJ's conclusion with respect to past torture,  is that although the agency recognized that the petitioner faced tragic and horrible harm during his kidnapping, the agency recognized and reasonably concluded that the petitioner failed to demonstrate that he faced a personal risk of torture in the future. I'd say, I'd emphasize- I thought their ruling turned on the fact that they didn't think it was the police who did this to him. I think, Your Honor, I think it was a collection of factors. I think that, and I think the record supports those, I think that the details of petitioner's kidnapping and the tragic but isolated nature of it supports the view that there's not a clear probability of future torture. Well, the question is, do you agree when- My specific question is, do you dispute that this, that he, that the chopping off of his finger was done by the police, or do you take the view that that should be rejected out of hand because there could have been people who were impersonating the police? I don't think we need to reject it out of hand, Your Honor. I think my position is we're not sure, we're not convinced. I think the record supports the conclusion that it's not necessarily a likely future government-sponsored persecution here. But what about, I mean, Judge Fischer touched upon this, I think, in his first question, but what about the fact that he was tortured? Do you dispute the fact that he was, that this was done by the police? Do you support a finding that this was not, that this was done possibly by private persons and he hasn't met his burden? I think he hasn't met his burden on that, Your Honor. But I think, I think what I'd try to emphasize more, and I think that that's kind of the most readily available grounds here, Your Honor. And do you agree, just, I don't want to lose this point because I quoted from the joint declaration, I assume you're listening to it, and there's clear indication that police actually engage in terrible conduct when they arrest somebody, and it's based in part, this joint declaration, on interviews that they conducted with prisoners. And on the other hand, the whole notion that there's no specific intent in general in these cases to torture is based on interviews with the alleged torturers who say, we didn't have the intent. I mean, this, do you agree that the joint declaration was not discussed? I think it wasn't specifically called out, Your Honor. Right, but there's clear support for the position of the petitioner that the police did it. I'm not suggesting, I think, I'm not suggesting that we necessarily have to resolve it finally as opposed to remand it, but it seems to me that they ignored clear evidence that would support the proposition that police engage in outrageous behavior and they pull out of thin air the notion, well, it could have been people who were impersonating police. Understood, Your Honor. Let me see if I can present a way that maybe more directly allows for the court to reject the Catt claim without needing to wade into maybe a more difficult question. Well, I guess I'm waiting for that. Yes, Your Honor. Is what you're saying is that even though they acknowledged it might be past torture, the kidnapping incident in Tijuana and all that it entailed, but that the finding that Carrasco failed to establish that a past harm he suffered was inflicted or instigated with the consent of public officials, or is it that it's likely not to happen again, or what are you saying is the... Yes, Your Honor. ...the path there? I think the easiest path is that the agency reasonably concluded that the petitioner did not establish that he is likely to face this kind of harm in the future from a state actor. But are you assuming he, we assume the VIA found past torture? I'm not, Your Honor. I guess we're not really pressing that piece of it. But I think what we're trying to emphasize here, Fisher, is if you look at the circumstances of this tragic past incident, it's that the petitioner, he suffered harm over the course of days, but he was ultimately released after a ransom was paid. He checked into a different hotel where he didn't have problems. He didn't report the crime, so we don't necessarily know what that might lead to one way or another in the future. Since that happened, neither he nor his family have apparently, at least on this record, been contacted by those responsible. There's just not an indication that this horrible event that happened in this one set period, this one set time in the past, is going to happen again. This court's decision in Wakari of 1068, for example. I think Judge Fisher's initial question was whether if it happened, if it met the definition of torture, then there's certain assumptions or presumptions that arise from that, that at least have to be considered. And so that's why it becomes critical, it seems to me, as to whether or not he was, in fact, this treatment that he was subject to, was by police or whether it was by people dressed as police. Because it triggers the Nuru presumption. That's why it's important. Exactly. I was referring to your question. Yes, I understand. I want to make sure counsel deals with Nuru. Your Honor, I don't know that it's necessarily, it operates as a full-fledged presumption necessarily. Well, it certainly does. I mean, if you find past torture, it puts them in a different position when you analyze future, right? Well, I think you have to, Your Honor, I think you have to consider the nature of the torture. I mean, in Nuru, the court said past torture is ordinarily the principal factor on which we rely, and I think it depends on the nature of what happened. I think what the panel's asking you, and we're kind of, it's like, Understood, Your Honor. It's like, okay, if that is not, if the BIA didn't clearly articulate whether it was, it seemed to take exception with what the IJ did, say, well, I don't think, you might not be right about that. Does there need to be a definitive finding? Does there need to be a remand to go back to the BIA to say it was torture or it wasn't torture, and then go forward and complete the analysis? Or are you trying to say that, no, it doesn't really matter whether it was or it wasn't, but doesn't it matter with what the lens is that you put on to analyze the future? I think the answer to your question is that there doesn't need to be a remand because of the way the Board of Immigration Appeals resolved this case. The Board, this is at page six of the administrative record, said, look, contrary to the BIA, this may rise to the level of torture. May I finish my answer, Your Honor? Please do. However, based on the particular circumstances of this case, I'm quoting, the applicant has not demonstrated he more likely than not would experience similar harm in the future. And the Board goes on to say, look, the applicant was the victim of a severe or a serious crime in Mexico, but we don't find clear error in the IJ's finding that there wasn't enough evidence that he's at personal risk of being tortured in the future. His main fear is about a kind of generalized violence that unfortunately ended up being visited upon him. Okay, how can we know from the record that the BIA gave him the benefit that it was torture in analyzing the future? Because I think the Board specifically acknowledged that possibility, Your Honor, but then went to emphasize the particular facts of this case, and emphasized an engagement with the record here and what the record here affirmatively or what the IJ reasonably concluded that the record here showed. So I think it's not a cursory dismissal saying, oh, you know, we agree that it's not clear error, period, full stop. Look, we look at the particular facts here, and we're just not seeing the personal risk of being tortured that you need to show a clear probability. Would it have been better if the BIA had said, we're going to assume that it was torture and then make the analysis, but he fails on prong two? Would that be better? I think it certainly would have resolved some of the panel's questions and concerns, Your Honor. Well, I think you can say it would be better. You're saying it's not fatal, but I think it would be better. It may have been helpful here, Your Honor. I think it's the rare case that establishes a CAT claim, and I think that it would be understandable if the agency is reluctant to reach that very weighty, important conclusion when it feels like it doesn't have to after engaging the facts in this case. All right, but if they meet the first prong, is the analysis different on the second prong? Not here because, again, I think- No, no, no, not here. Judd, it's a lot different if you establish past torture. Is the analysis as you move forward different? Do they get a presumption? Does it help them? I think it's ordinarily-the best I would say is I would use the language from Nehru, Your Honor. Well, if there's no torture, then you move forward. Isn't it different how you look at it? Is the law different or not? I think as a general matter, you'd have to give close attention to what that past torture finding is, Your Honor, but I just don't think the issue is presented here because of how the board analyzed the situation. All right. I think we've-I think we understand what you're saying, but okay. Thank you. Thank you, Your Honor. Your Honor, this record compels a finding of past torture, and we ask that this court ream in proceedings for that finding. And with that, I have nothing further to say. Okay. Thank you. Thank you. So this matter will be submitted at the end of the amici when that argues, and as indicated, I'm going to take-we're going to take a short recess right now, and I would say it will be in the area of five to ten minutes, so it's enough time for you to use the restroom if you want, but not enough time to go have a meal. So I'll be-the people in the next case should stay close. All right. All right. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Okay. Let me just go over this. Okay. We're now in the matter of Jorge Cornell's defendant, which is Matthew Ritiker, 17-73046. So if it couldn't get communicated, it may have. So, we each have ten minutes, and that for a petitioner or appellant, that includes refutals. But my understanding is that the appellant petitioner side wishes to split the time for, I've just written for Sony, seven minutes, and I'm not sure if I'm getting to five. Okay. Three minutes. And I'm assuming that probably three minutes is barely going to get your name out. But that being said, that's how you divided it. That's what your rebuttal time is. So, good luck. Good morning. Speak up. Yes, Your Honor. I'm ready. Good morning, Your Honor. May it please the court. Good morning. Good morning. Good morning, Judge Fischer. May it please the court. My name is Monique Sony, counsel for petitioner Jorge Cornell Resendez. With the court's permission, I would like to reserve two minutes. And as Judge Callahan stated, we've also ceded three minutes of our time to Amiki for disability rights. So, right now. Okay. So, that means if you want to reserve two when that clock gets down to five, I'll notify you. Okay. Thank you, Your Honor. Petitioner's case turns on the scope of this court's holding in V.A.S.D. McCasey and requires de novo review. We are here because of the agency's failure to correctly construe the CATS requirements of specific intent and aggregation of risk. Your Honors, to begin with, this is what is not in dispute here. Here, there is no dispute that workers in Mexican psychiatric institutions, state actors for the purposes of the CAT, as the I.J. found, intend to engage and do engage in specific, discreet, and repeated actions. That is to say, they do not subject patients to abusive practices. But what do you do with JGRP, which has happened subsequently? You can't just ignore it. You're right, Your Honor. And, in fact, the matter of JGRP is my case, and we're actually challenging that case before this court because we believe it commits the same error that's present in Mr. Cornell's case. Okay, but let's assume that we have to deal with it right now. Okay. How do you get around it? Well, Your Honor, in that case, that case is not theoretically even binding on this court or on this appeal, given that it came out after, in the course of recent cases. That's the BIA decision, right? Correct, Your Honor. But there, the board was reviewing the I.J.'s findings under the clearly erroneous standard. And here, the same sort of issue has happened. And so, under the CAT- Okay, I'm confused. You said it's wrong first, but then you said we don't have to follow it. Right. In that case, they reviewed the I.J.'s findings for clearly erroneous and found, similar to the I.J. here, that under VIEGA, that there's no specific intent. But they- Right. Okay, factually, you can possibly distinguish it, but there are some- but they do talk about certain things about the Mexican government's specific intent to harm a mentally ill patient. Correct, but it's based on the record present there. It's not a categorical finding. And, in fact, if it was, that would be contrary to the requirement that every protection-based claim be provided with individualized analysis and a determination be made based on the record evidence submitted in each person's case. Okay, so besides the fact that these methods are still sometimes used, is there any evidence in the record that Mexican mental health workers resorting to these methods understand they are harmful and not appropriate and use them because they want to inflict harm on the patient? Yes. Well, first, I think it's important to point out that actually it's not the case that- the record evidence shows that these practices are widespread. So it's not sometimes. And, in fact, the IJ herself made a finding that these abusive practices frequently occur in these facilities and that patients who exhibit erratic and aggressive behavior like Petitioner are the ones who are targeted with these practices. And didn't it go back one time for clarification on that? Yes. Sorry, that the IJ made the finding at AR 123? Well, it first went to the BIA because there was a discussion of all the deplorable conditions and the BIA sent it back to say, well, okay, if that's the case, address the intent issue, right? Correct. Well, actually, two things, Your Honor. In the initial remand, the board actually pointed out that the IJ's decision couldn't be reconciled with the record evidence, whereas the IJ was finding-kind of disregarded the fact that there was conduct here and said that this is conditions and the conditions are due to budgetary economic reasons. The board corrected the IJ and said that that's not logical. You've not explained how the conduct that you yourself have acknowledged exists is the result of economic budgetary issues. Okay. I know that the Harvard professor is going to address some of this on Villegas, so our time is limited. Yes, Your Honor. You say that-you argue that it was wrongly applied in this case based on a distinction between condition-based and conduct-based categories, given that Villegas court considered both conditions and conduct. How is this different? Actually, Your Honor, the evidence that was submitted in Villegas with respect to conduct pertained to the evidence that was found in the children's ward, where they specifically say that they were tied to their beds, and then there was, in passing, an NPR report that they mentioned that individuals were sometimes chained. Since Villegas-I mean, we maintain that the evidence that we have does not put forward this court in Villegas, and we want to make clear that we're not challenging Villegas. No, we're asking this court to overturn it. However, there is-the record evidence here is distinguished to this in Villegas, and, in fact, I think that this case-this court's decision in NAAB Holder is more relevant and bears directly on Petitioner's claim. There, the individual had HIV and AIDS, produced evidence that he himself would be singly-would be singled out, targeted, and, you know, medications would be deliberately withheld from him. Here, too- Okay, you used your time, so I don't want your counsel-co-counsel to be freaking out there. So I'm not going to let that go. You still get your whole three minutes. Okay. That's the-and I'll give you two minutes for rebuttal. Thank you. Okay. And then we'll-if we have additional questions at that point, after, we'll carry over. So let's put it back to-well, I'm going to give her two minutes on rebuttal, and then I'm going to give you three. And do you want to save any time for rebuttal? No, thank you. You're just-okay. I'll keep it to the straight three minutes, if that's all right. Okay. All right. Thank you. Good morning, and may it please the Court. My name is Nick Dufault, the law firm under Colson Olson, and we represent Amici in this appeal. And with the few moments that I have, we wanted to make a simple point on behalf of the medical and human rights organizations that I represent, and that is that the conduct to which Mr. Corneau will be subjected shocks any sense of decency. It does not cease to constitute torture simply because it's ostensibly mental health treatment. So in our brief, we talk about various types of conduct. We talk about prolonged restraint. We talk about forced medication and invasive procedures. But those are clinical terms, and they mean something very specific. It means an individual being tied from head to toe to a wheelchair permanently, that is, for 24 hours a day, for many, many years. This can lead to ulcers, gangrene, spinal abnormalities, and ultimately death. Involuntary overmedication refers to forcibly giving medication until patients uncontrollably shake and suffer from permanent nerve damage or brain dysfunction. It also refers to involuntary lobotomies, where individuals are sedated while surgeons cut out the prefrontal lobe of their brain until they are left in a permanent state of stupor and confusion. If that conduct were inflicted... I'm sorry, Your Honor? Could you address the question as to what evidence is in the record that he would actually be hospitalized in Mexico? He hasn't been yet. Yes, Your Honor. On this, there are many points of undisputed facts in the record that compel the conclusion that he will be hospitalized. The first is that hospitalization in Mexico is the standard treatment for people who are schizophrenic. Secondly, in order to get any sort of treatment whatsoever, he will have to be admitted to a mental health hospital in order to get any sort of medication, let alone the medication for him, which is not available in his country. Wasn't there a finding that he would have to undergo treatment in an institutionalized setting? Yes, that's right, Your Honor. The IJ found that below. And in fact, the IJ found that the conduct to which he will be subjected in those institutions does rise to the level of torture. And finally, in addition to those facts, there's also the fact that he does not have family in Mexico, which is the key factor, as the expert explained, in determining the length of institutionalization. Well, let me point out another factor about your client, if I may say as your client. Your client is also an overachiever in criminal convictions of all the defendants that we have here, right? He's been to prison several times, right? Yes, he has been to prison. And committed fairly violent crimes as well. Yes, Your Honor. And so the combination of him having violent criminal convictions and mental illness does not make him really a safe person to have anywhere. Your Honor, I see I've run out of time. No, go ahead. Answer. Your Honor, regardless of the past conduct for which he's been convicted, that doesn't change legal standards under the Convention Against Torture, which is a categorical prohibition on torture. And on this record... Well, I guess what I'm asking is that there's no doubt that how we treat people with mental illness is better here, okay? But when you're asking for a standard, is then everyone that has mental illness, despite the fact that they have the ability to go to prison here several times, commit a lot of crimes, and are probably really, you know, as a judge I would say quite dangerous to the population at large, that they're entitled to cat relief to be here and be dangerous here. Your Honor, we're not trying to make the point for a categorical finding as to all people who suffer generally from schizophrenia. Rather, on this record, given his specific conditions, his place of origin, his family conditions, he will almost certainly be subjected to torture if he's returned to the home country. And we're also not trying to ask that overnight somehow Mexican mental health institutions overhaul its practices to meet the standards of what we've set out here in the United States recently. We are only trying to say that the types of conduct that are at issue in this case are positively inhumane, that we are decades removed from when these types of conduct were universally taken out of the spectrum of mental health treatment. Okay. I think we've gone over, but I think everything that you've said has been useful. Thank you. Thank you very much, Your Honor. All right. We'll hear from the government. Aren't we on to the government? Oh, that's right. That's right. It's not you again. All right. You're appearing by video. I'm sorry. All right. So thank you. Yeah, it's kind of small here, but we can see you. So please keep your voice up. Judge Fischer, before we start the time, can you just state your name, I'll have you redo it, but I want to make sure, because Judge Fischer is on video, too. All right. Is that transmitting okay for you, Judge Fischer? Would be helpful? Okay. If you need to sit to be closer, that will not be taken as a sign of disrespect, but I still need to see you above. It's not a very big screen. Okay. Judge Fischer? Yeah. Okay. All right. Let's start the clock and state your name and appearance. May it please the Court. Jose Zamora for the Acting Attorney General. This petition for review should be denied because the evidence does not compel the conclusion that the petitioner will more likely than not be tortured in Mexico by police, gangs, or in a mental institution. Furthermore, this Court should deny the petitioner's counsel's request for fees because the Criminal Justice Act doesn't authorize fees in cases arising under Section 1252. Well, I'm happy to answer the Court's questions on that issue. Well, I think the way we have that divided, I think we're planning to address that completely at the end with – just stop the clock for a second. Mr. Stewart, are you going to deal with all the criminal justice issues? So, you don't need to talk about that, okay? We're dealing with that on all of the cases at the end, so just deal with the merits of this case. Okay, start the clock again. Go ahead. Okay. So, turning to the primary issue in this case, the evidence does not compel the conclusion that the petitioner will more likely than not be tortured in Mexico in a mental institution. It fails to show that each link in the alleged events that he claims will occur will more likely than not happen to him. First and foremost, substantial evidence supports the immigration judge and the Board's determination that effective alternative remedies – that the petitioner has not shown that alternative medications are not available in Mexico. The petitioner's own evidence, the Joint Expert Declaration, states that common substitutes for the psychotropic medication he's taken, Thorazine, are available in Mexico. The petitioner has not shown that these alternative medications would not be available to him. Well, first of all, from what I understand, it's arguable, assuming that there are, and I think you may be overstating the Joint Declaration. I think they say that it's unlikely that he would receive the kind of medical treatment and medicines that are available to him in the United States. And to the extent that there may be alternative medications, he has a series of other medical conditions which may be adversely impacted by the change in medication. So I don't know, is it as clear as you suggest? Well, what I'm stating is that it's his burden of proof to show eligibility for cat protection. His own evidence indicates that there's alternative remedies. In fact, he was on a different set of psychotropic drugs in 2013, I believe. But he hasn't submitted any evidence, any medical evidence, to say that either those medications are unavailable in Mexico or that they would not be effective for him. I think Mr. Resendez, or Cornell, argues that there was imposed upon him a heightened standard of proof as to specific intent because the IJ statement faulting Cornell for failing to present evidence clearly establishing the specific intent of the mental health workers. Is that problematic? No, Your Honor. The immigration judge and the board both applied the more likely than not standard, Your Honor. And a reference to clearly does not mean that it is imposed a heightened standard. And just to backtrack a little bit, the availability of the medication, if substantial evidence supports the board's decision on that, this court doesn't even have to get the specific intent, Your Honor. Because his theory is that he won't get the medication. If he doesn't get the medication, then he'll act erratically and aggressively. If he acts aggressively, then he'll be subject to treatment that's extreme and that this treatment would be specifically inflicted for the purpose of causing severe pain and suffering. So he has to show that each link in those chain of alleged events has to more likely than not occur. And he would fail on the very first, Your Honor, because he hasn't shown that the effective medication is not available. But even assuming that he would not get the effective medication and even assuming contracted psychological evaluations, that he would become aggressive, he still has not shown, even before he gets the specific intent, that he would be in a inpatient facility that engages in conduct that he alleges rises to the level of torture. The experts... I'm sorry, he doesn't know which particular facility he's going to wind up. But there is overwhelming evidence about the acts that patients in these medical institutions are subject to. So what is missing? Are you arguing, as maybe the BIA suggests, that you can't infer intent from the nature of their intent to engage in imposing punishment from the very nature of the acts to which they're subject? Neither the board nor the immigration judge made a legal conclusion, Your Honor. They made a factual finding as to specific intent. And this goes... They didn't discuss the joint declaration, right? In the earlier case, of course, you weren't here. Well, the immigration judge considered all the evidence and in particular even summarized the expert who testified about the joint declaration. I mean, all the evidence was considered in this case, Your Honor. And furthermore, it should be noted that the joint declaration... There's no specific mention of this joint declaration. I don't think there might have been a specific reference, but the immigration judge, I believe, does state that even if evidence is not specifically mentioned, that he has considered it. Can I ask you about JGRP in terms of how that factors into our analysis? You heard the Petitioner's Counsel's position on that. Yes, Your Honor. How does that affect our analysis from your perspective? Well, JGRP just affirms what the government's already argued in the brief. The new argument that the media has already used about how Mexico hasn't improved this situation and this somehow shows specific intent, that was rejected. It still relates to mental health institutions, these horrible situations. That doesn't require an inference of specific intent. And it's really just an application of the facts to the law, Your Honor, as it should be applied here. And, Your Honor, just to kind of go back to the... about whether the expert declaration was mentioned, the immigration judge does list every evidence in the first decision, the documentary evidence. So he did consider the evidence... To list it, that's one thing to put a list of all the evidence that's been offered. It's quite another thing to discuss it in an opinion. Well, it was not a particularly large part, Your Honor, because there was enough evidence in there to show that there was not a specific intent. Even the 2010 and the 2015... Maybe it would be helpful, or it would be helpful to me anyway. I can't speak for everyone. From our standard of review on specific intent, clearly there was evidence presented in the record of the deplorable conditions and everything that happened. What is the evidence in the... Because if there are alternative views to look at the evidence and the way that the agency determined is supported by substantial evidence, we can only change that if a different result is compelled. What is the alternative evidence and how does substantial evidence support that? That's absolutely correct, Your Honor. What is it specifically in the record? What is it specifically in this record that counters, from your perspective, the deplorable conditions and the awful things that happen to people and the kind of horrible mental health system? So I would like to answer this in two parts. First, to address the specific intent argument, the 2010 and the 2015 DRI report consistently describe the restraints and the psychosurgery as methods in order to prevent the person from self-abuse or abusing others. And I believe the language they use in the report is well-meaning staff, well-meaning staff who have no other option but to restrain persons because they're not aware of any alternative behavioral or therapeutic methods. And also, Your Honor, just to return to that joint declaration, it should be noted that the country reports that the immigration refers to are the worst of the worst. According to the petitioner's own expert declaration, 50% of persons who receive mental health care in Mexico receive adequate care. So that's the baseline, Your Honor. The fact that there is abuse is absolutely true, but the question of is it more likely than not, and more importantly, does the evidence compel that conclusion, the petitioner in this case certainly has not met that burden in order to have his petition for review granted in this case, Your Honor. I have to ask a question. This is going to take you over, but I want you to answer this. Is that in terms of when you look at the tortures that are alleged, that they were analyzed, but did anywhere in the record, was it analyzed as to what the aggregate risk of the torture was of the sources? And I think it's what Cole Quijada says you have to do the aggregate analysis. Was that done here? I can't see that. Yes. Well, if you look at the petitioner's brief, he particularly makes the aggregation argument, says that's an error, and the board says we have carefully considered every argument in the petitioner's brief, and also concludes generally that the petitioner has failed to meet his burden of proof that he would more likely than not be tortured by or at the acquiescence of the government. So there is a sufficient address by the board in that regard, and furthermore, the police and the gang elements of the claim is particularly relatively minor because there is a finding here that the petitioner is going to seek inpatient care. There's no evidence, much less compelling evidence, about gang or police activities in inpatient care, Your Honor. So it's not a very large part of the analysis, though it's clear from the board's decision that the board did consider the aggregate. Well, they considered everything. I'm not disputing that, but is there any finding that says, okay, we're rejecting this, this, this, and this, or four things, and then did they say, even if we consider all of them together, it still doesn't amount to it? Did they do that? Or is it your argument if you go zero plus zero plus zero plus zero equals zero? But I'm just wondering if the case law requires a more specific finding. No, Your Honor. The board and the immigration judge rejected the police, gang, and the mental health claims, and the board's final decision is that they considered all the claims, including the argument that in the aggregate. No, I'm not arguing. Is the word aggregate there anywhere? They considered all of them, but after they rejected each one, did they say, even if considered all together, it still doesn't? There's not an expressed finding that way, but that was the argument that was made. It must be considered in the aggregate. I believe it's the first footnote in their brief here, in their appellate brief, Your Honor, administrative appellate brief, and the board says we considered each argument raised by the petitioner. So, you know, if the petitioner argues aggregate, and the board says we considered that argument, but we still find he's not eligible for tax, then there's clearly been enough done by the board, particularly where the police and gang claims are weak in this case, Your Honor, on the merits as far as likelihood of harm, and also on the efficacy issue, Your Honor. Okay. Let me find out if my call, I've taken you over, but I wanted those questions answered. Any additional questions? I just want to understand, on what basis did the BIA conclude that this was all due to lack of resources, inadequate education? What was the source of that? Was that simply based on interviews with the people who were engaging in conduct that would otherwise constitute torture? No, Your Honor. It was based on, there's about 2,000 pages in this record, but one of the main sources are the DRI reports, the 2010 and the 2015 reports. To the extent that they're accurately describing it, it's simply quoting the people who were engaging in conduct that would otherwise constitute torture, saying, in effect, we didn't intend to cause punishment. Isn't that what this comes down to, that you're basically relying? To my mind, it's sort of the equivalent of a concentration camp guard saying, I was just following orders. Do you expect people who were engaged in conduct that would otherwise constitute torture to say that they intended it to be torture in the sense of intending punishment? Thank you, Your Honor. That's what they're saying, in effect. And that tends to sort of wipe away an inference that a reasonable person might draw on many of these instances, that from the conduct itself, don't forget, we can consider, I don't think it's an issue that we can consider both direct and circumstantial evidence of relating to the intent of the torturer. Yes, Your Honor. And the petitioner's own expert testified that the ultimate goal of the Mexican health care system is so that people will get better. I mean, it's not to say that's what it's like. I mean, it's hard to keep all of these facts clearly in mind. But it seems to me that notwithstanding whatever laws there are in Mexico, or even policies, that they're simply not being enforced or followed. Because from Villegas, which was decided, and I think that case is being, too much is being read into that case. But from that case in 2008 until virtually today, there's no indication that anything has changed, notwithstanding all the motives, the good motives that are attributed to the Mexican government. Well, respectfully, the record would not require that finding, Your Honor. I mean, the report itself shows that, you know, the Mexican government has blacklisted 25 institutions. Of them, they started five investigations. They allowed DRI to go into these mental institutions. They come out with these reports. And not only that, but they've closed them down. There were rapes committed in one of these child institutions. I forget the name of it. Mamarosa, yes. Where the person in charge was, no action was taken at all. Well, there were six convictions that arose from that. And the Mexican government did close the facility. And furthermore, it should be noted that the petitioner is not arguing rape. What he's arguing is that he will be subject to treatment. And that treatment, it should not be a pretext for torture. He's not fearing criminal. Well, the treatment that he could be subject to could include anything from sterilization to lobotomies to electroshock therapy. I don't even understand the issue to be that the conduct wouldn't constitute torture, except for the fact that the people who are the torturers are saying, well, we didn't intend to do this for punishment purposes. According to the DRR report, Your Honor, psychosurgery is a legitimate medical procedure. I'm not defending how Mexico uses it. The criticism is the lack of informed consent. So the way all of this is being explained as somehow per se torture is not necessarily true. I mean, psychosurgery, ECTs, electroconvulsive therapy still occur in the United States as well. It's how it's implemented, Your Honor. And the board here found that it's not more likely than not that the way the treatment is implemented in Mexico would necessarily require a finding that the petitioner would be tortured. And this court, because there is substantial evidence supporting that in the 2010 and the 2015 DRI reports, is bound by that finding, Your Honor. And that's what the INA requires, and this court should deny this petition for review. Okay, thank you. All right. We have two minutes for rebuttal for this petitioner, depending on questions. To begin with, Your Honor, with your question regarding aggregation of risk. Here the board specifically didn't address that. I raised it in my appeal at AR 488-4. The board says that we're not going to address the aggregation requirement because we don't need to. Thereafter, every time we raised it, it was never addressed by the board. And there's no mention of taking a cumulative analysis. Can you direct me to where they said we're not going to address it? AR 484, Your Honor. Okay, thank you. And to that end, had they done the, you know, remand is necessary because the aggregate, the cumulative analysis was not done here. Just yesterday, the Fourth Circuit issued a precedent decision relying on this court's decision that requires that torture claims be considered in the aggregate. And there they talk about the fact that you need to take the cumulative analysis of the probability of torture. And here, that would have required the IJ to look at both his fear of torture at the hands of health care workers, at the hands of the police, and gang members. There was never an analysis done of the cumulative effects of the fear that he faces. Second, with respect to the issues that the petitioner raises or the government raises, it's very important here to emphasize that this is not a conditions-based case. Petitioner is not asserting a fear of deplorable conditions, which is what the issue was in Villegas. Nor, and he has adduced evidence of specific intent. He is, he fears torture at the hands of health care workers. And that is who the malfeasance is in this case. It's not the Mexican government at large. The IJ herself found that these health care workers subject patients to sexual and physical abuse. Patients who exhibit erratic behavior to a whole host of abusive practices. And here, the IJ was required to make inferences of specific intent. In her decision, the IJ specifically says, I decline to speculate. I decline to make a finding here of inferences. That was the IJ's job. The board did not correct her. Remand is therefore warranted. And with that, Your Honor, I thank you. Thank you both for your arguments. All right. This matter will be submitted upon the conclusion of the argument in the final case that we have here, which covers an issue that goes across all. And that is, I guess it doesn't really have a case number. It's just how we broke it out. And so we're going to have the ACLU, as amicus curiae, and the United States. And each side has the amici has, I guess, 10 minutes for the benefit of the court and the government 10 minutes for a response, is my understanding. So just before I start the clock here, I see two people seated at your table. Are you going to use the entire 10 minutes? Yes, Your Honor. Okay. So you won't be sharing time. So I don't have to worry about that. But I would like to reserve two minutes for rebuttal, if that's okay. No, if amici get rebuttal. Our understanding was that the government was going to argue this issue before and that there wouldn't be an argument. And so we would appreciate, because we haven't heard the government's argument, especially on the due process clause. So we would appreciate that. Oh, okay. Yeah, I guess then you don't – okay, yeah, I think it's right. The government is going to – are you going to argue first? Okay. Well, okay, then the government won below, right? There was no motion for appointment of counsel for that issue. That's right. Before this court right here. Our understanding on the day sheet was that the government was going to argue this portion before. But you're the one that – but it was all brought up by the petitioners. It wasn't brought up by the government, right? Yes, Your Honor. So we are fine to go first. And I would just request, because the court also asked supplemental questions regarding the due process clause. We haven't heard the government's argument. At least for that portion, I would like to hear the government's rebuttal. Well, what you would like and what will happen, we'll see. Okay. I mean, I think the way that we've got this going, I don't think that there are any sort of strict rules. So I'm just going to see what the court needs to hear. So let's just say – why don't you argue nine minutes. Okay. Thank you very much. And then I'll hold the one minute in the quiver here. Okay. I appreciate that. Okay. And I might then go back to the other side if I feel that that's the case, because I don't think that there – we just want to get to the bottom of this. Of course, Your Honor. Okay. Thank you. Go ahead. May it please the court, Samir Ahmed on behalf of NEC, ACLU, and ACLU of Southern California. Now, whether analyzed under the due process clause, as this court's question suggests, or under habeas jurisprudence, this court should appoint and compensate counsel here for two main reasons. First, all petitioners were found not competent to represent themselves and without counsel would have been deported without any opportunity to challenge their removal orders in federal court. Well, okay, but it's sort of what happened below. Let's face it here. Everyone's – there's been competent representation throughout. So – and what happened below was really a response to a district court order, kind of a settlement that really isn't binding on us, but the way the government responded to it was they – on the qualified representative, they set up a program that allowed people to have lawyers. Yes, Your Honor. So now we're really talking about on appeal, right? Yes, Your Honor. We're only – and on appeal, these petitioners are also not competent to represent themselves and would be deported without any opportunity in this petition for review. There hasn't been specifically a finding of that. There hasn't been a finding. So we appointed pro bono, and as a court, we can – if we feel that something would help us, we can do that. So – and that they're asking to be compensated, asking for the government to pay for them. So you've got to tell me – you've sort of got – you're pulling together the all writs, the CJA, the this, that, and the other. Yes, Your Honor. I'll get to – I'll definitely get to that. But for the purposes of this argument, I don't think there is any dispute that the petitioners are not competent to represent themselves and wouldn't have been able to file a pro se petition. Well, I don't think it matters. They've had representation. So now you're asking for pay. They're asking for pay. So, Your Honor, the pro bono program is not an adequate substitute here. First, all the petitioners in these cases, their counsel only accepted appointment under the pro bono program without prejudice to raising their arguments here. That's why we're here. So the court should treat this issue as if they were never appointed under the pro bono program. Why should we do that? Because that's exactly what the motion panel order said. I understand that, but maybe you could help me. I'm not unsympathetic to your general argument. Certainly I would fire them in the legislature. I'd vote for a statute that gives you what you're arguing for. But the right that you're arguing for, it seems to me, is the right of the petitioner. The petitioner is entitled to counsel, and he's had it. And you are essentially, I don't have anything wrong with it, but his due process rights have not been violated. And essentially what you're asserting is your right. I don't mean you personally, but the right of the people who have represented him and have given him the counsel that he's entitled to, to be paid. And I don't quite, I don't know whether standing is the right word for it. Maybe it is. What's your standing, since it's the right of the defendant, if anybody's not the defendant of the petitioner, to counsel? Yes, Your Honor. And let me explain why the pro bono program is not a sufficient, adequate substitute here. Under the suspension clause, this court requires an INS first name here that there has to be some judicial review of removal order. And none of these petitioners were able to file a petition for review without counsel. Now, the pro bono program only applies if a petitioner for review is competent enough to file that petition for review, and then with a pro bono program, and the court could appoint it. So, going back to Your Honor. But we presumably relied on the finding that was made below, which resulted in the appointment of counsel pursuant to the, what I'll call, I don't remember the name of the case, but the class action. So, somebody was appointed, they represented him, they filed a notice of appeal, and I presume they continued to represent him. Well, Your Honor, they don't, their contracts don't provide the ability to represent them on appeal, but also they all filed declarations that they didn't, they cannot, they don't have the capacity to represent these cases without compensation. And they are the only... I don't know what that means, they don't have the capacity without compensation. They either have the capacity or they don't. The compensation is not unimportant. I'm not suggesting otherwise. They signed up for the pro bono program. Well, Your Honor, they only did that. Your Honor, if you look back at the motions panel order and exactly what the motions panel said and what they did, as they said, we are only accepting appointment under the pro bono program without prejudice to raising these arguments. And therefore, what the proper procedure for this is for an individual to file a motion for appointment of counsel before they had counsel appointed under the pro bono program and make these arguments. The petition of the CJA, if any, authorizes this court to compensate counsel on a petition for raising... Thank you. I can't find it. Okay, Your Honor, well... These are people that are not citizens and they're people that have mental health issues. And the lower court district, the district court decision that set up the qualified representative was based on 504. It was a Rehabilitation Act thing. It wasn't, it's not, it's not a CJA thing. Yes, Your Honor, let me turn to that. There are two provisions of the CJA. First in our brief, A2B, which is a habeas provision. In Singh v. Mukasey, Judge Fisher, and in Ramadan v. Gonzalez, this court repeatedly said that Congress intended the petition for review process to be an adequate and effective substitute for habeas. Okay, but people on habeas, they're locked up in prison. They're citizens that have committed crimes. They're not the same as people that have been, that are not citizens. And any of these clients could actually say, okay, I lost. I got my qualified representative. I got my counsel. And then I lost. And they could just go back. Your Honor, this question is well settled. The Supreme Court in INS v. St. Pierre said a noncitizen in habeas has the right to challenge their removal order regardless of whether they're detained or not. Okay, they have a right. And let's assume that this is the place to do it. But it also, the statutory scheme says you have a right to counsel, but not at the government expense. There's also that. Your Honor, that statute only applies in removal proceedings. We're in a petition for review. If you look at before the petition for review process, the CJA was repeatedly used by federal courts, by individuals who were challenging their removal orders in federal courts. I do all sorts of petitions for review in the Ninth Circuit of people that don't have representatives. I understand, Your Honor, but all these individuals were found not competent to represent themselves. Also, the second point I was going to make, all their cases have likely merit, and they're all complex. So why can't this court decide on a case-by-case basis if we need someone to assist in deciding this case, as opposed to everyone can file something and say, oh, I have a mental health problem. Therefore, appoint me counsel at the government expense. Your Honor, we do agree that it is a case-by-case analysis. And if you look at the interest of justice factors in the CJA's first provision, the habeas provision A to B, the factors that courts, district courts, commonly determine to use, whether an individual, do they have capacity to make the argument, is it complex, and is the case likely merit. And in those factors, we believe in the interest of justice. The court has authority. Let me ask you, has any other circuit or the Supreme Court ever gone so boldly as where you're asking us to go? Well, under the due process clause, this court said in Anderson v. Hines that there is a due process clause right for a petitioner to make an argument under appointed counsel. I wanted to go back, though, Your Honor, to the CJA provision. I know I am over time, but I would also like to explain why the All Writs Act provides appointment of counsel. And then I also haven't answered the court's question under the due process. Well, and you're also over time, and you wrote a lot before you came here. So I'm going to take you on your, I'm going to call you on your time. I'm going to hear from the other side. And if we need to hear more from you, we will. Thank you very much. Thank you. Okay, so he has at least one minute, but I can give him more time if I want to. Thank you, Your Honor. May it please the court. Scott Stewart again on behalf of the Acting Attorney General. I'd like to touch first on the statutory matters, Your Honor. Then I'd like to move to the suspension clause. I'd want to make sure to hit the due process clause in the court's questions there. And I may also want to touch on some points on the pro bono program and some other things. As an initial matter, Your Honor, and I think some of Judge Callahan's questions get to this point, there's no text in federal law, federal statute, that authorizes appointment of counsel in this case. The CJA doesn't permit it. It actually militates against it. The INA strongly cuts against it. The key point I'd emphasize is that there's no claim in this case that there's a square authorization of cases up here on under 8 U.S.C. 1252 are eligible for appointments under the Criminal Justice Act. The Act is quite clear that these are suggested as a provision applied to habeas statutes 2241, 2254, 2255. Congress has not added 8 U.S.C. But their argument is that it's analogous to habeas corpus. In the sense that some of these people may, in some cases, they may actually be held in custody. And the fact that they are facing deportation and are subject to some, assuming they filed, they're subject to restraints on their freedom, even if they're not incarcerated. And their argument is that this is analogous to it. That they're, let's assume we're dealing with someone who was in an INS jail. And he would be entitled to challenge the lawfulness of his detention to say, come into a court and say, by what right am I being held? Your Honor, in the vast, in petition for review cases before this court, however, the overwhelming issue in this case is removability and whether somebody is actually going to be removed. It does fulfill, the suspension clause deals with, at its core, executive detention. And what St. Cyr is getting at is that St. Cyr had held that it would be a serious constitutional problem to completely cut off certain legal questions from judicial review. And this is the only judicial review. Because you go to IJ, you go to BIA, and then it's directly here. Right, they're channeled here, Your Honor. So the question is, at that point, so let's assume that they have a right to that. To file the petition for review. So what do we do if, are they, the fact that they got protection under, I guess, what is it, Gonzales? Franco-Gonzales, Your Honor. Franco-Gonzales, yes. Does that mean that automatically, for a petition for review, that therefore, is that binding on us for a qualified representative? No, Your Honor, that's a Rehabilitation Act claim. It's kind of a discrete set of folks in three different states. It's a little bit... But let's say on the due process, if we accept the fact that they do have a right to file a petition for review. If a person has a mental health issue, filing a petition for review is on the record that's already been developed. Is it possible that there might be some instances that a court could decide that without having lawyers? I mean, we do it all the time with people that don't have mental health. It's not like there's a lot of immigration cases we decide without lawyers. They don't do a great job, but they represent themselves. Well, I think it can readily be done, Your Honor. In these cases, they are administrative record cases, so it really is a what was the record developed? You have to put the record together, right? Right, and the record is before this court. The court has the record. The court has what the agency did. It's important how legal arguments are made. It's not just that it's a record. It's a question of relying on lawyers to alert the court to the legal issues that are presented by the record. Lawyers' arguments do elucidate those points, Your Honor. I think on the due process clause, I guess I'd make several points. First, I'd just emphasize that no party and even the ACLU pressed a due process claim. I know. We have it. Right. Well, I've just emphasized the importance. I mean, the ACLU is well aware of the argument, as Judge, Your Honor, is aware. The ACLU has presented due process-based counsel arguments before this en banc court very recently. They are well aware of the argument. If they thought that there was something to this argument, one would have expected to have seen it in their rather lengthy brief. The parties didn't raise it. In one case, at least Mr. Carrasso-Gonzalez explicitly disclaimed making the argument further. I'd say that after recognizing that point, I'd say a few things kind of follow. One is that that goes a long way to basically defeating any substantive due process claim, that there's no long history or tradition of this kind of appointment, no fundamental right. On procedural due process, and I want to be cautious in this because, again, as Judge Callahan and the court is aware from the CJLG case regarding right to counsel for minors at government expense and removal proceedings under the due process clause, the Matthews v. Eldridge analysis is very involved. It involves a careful look at all of these factors. Here, we don't have the presentation of what would this group be. Do we really need counsel? In this context, when we're not dealing with core losses of physical liberty, we're dealing instead with removability. We have a presumption against the appointment of counsel under the due process clause at government expense. It's seen in this case that- So as the case was presented, take our question out of it. What is your perspective on what the court has to decide? The court should decide that it should reject the appointment of counsel on the ground that the articulated grounds statutory, none of the statutes authorize appointment of counsel. I think it's not by its terms authorized by the CJA. Again, that does not- I'd emphasize there that even my friends on the other side emphasize that the provision for them is that the interest of justice so require representation may be provided. This indicates that there needs to be some affirmative indication as a statutory matter for this court to have authority to appoint counsel. That provision doesn't give it to this court, and the Immigration and Nationality Act itself strongly cuts against this sort of thing. It squarely provides for no government-appointed counsel in immigration removal proceedings at the IJ stage or the BIA stage. Given those kind of specific CJA and INA dealing with the counsel issue, there's no basis for reading into the habeas statutes, the All Writs Act, a sweeping authority to appoint this counsel in this kind of case. So are you just basically arguing a separation of powers issue? I mean, Congress could do it. Congress could provide for- Congress could say we are going to compensate or pay for counsel in these cases. I think, Your Honor, I think assuming that it acts within an enumerated power, I'd want to think about that. But it has- if it did so, it could provide for counsel. I would also just say that I just- there isn't a showing that counsel is needed in this case. I mean, taking just the pro bono program as an indicator alone, as I understand it, in a former time I participated in that pro bono program, those invitations go out to a great, great many people who seem to be very eager to get in court and step in. Usually when you're- when you have a situation where there's no statutory text that authorizes something, where the court would need to reach a constitutional type ruling potentially, you don't do it unless it's absolutely necessary. We just don't have- the petitioner hasn't shown that people's cases who are in this circumstance would never reach this court or there isn't some other way to address any concerns. Petitioners have been represented by counsel throughout and gotten all their arguments presented. And, you know, a sweeping ruling of the sort they claim is surely not warranted. I would add that suspension clause, I briefly touched on this before, but, again, what Sincere is about is saying that, look, you can't completely close off judicial review. You need an adequate forum, a judicial forum to test certain kinds of claims. The petitioner has that here. He was able to pursue it here. It was an option. There's no showing that he wouldn't have had counsel, had current counsel not stepped forward. And so for all these reasons, Your Honor, the statutes don't authorize it, and they, in fact, affirmatively, I think, indicate that there's no basis for this sort of authority claim. There's no need for the suspension clause. This does not involve a core habeas issue where the suspension clause would be appropriate to be implicated. And, finally, the due process clause, not just because the issue has not been adequately raised, but because there's no basis in our history, traditions, or grounding of fundamental rights to announce this right, and the procedural due process point is an involved analysis. It wouldn't support it here, especially because the bulk of these cases have not been shown to involve challenges to confinement, kind of areas where physical loss of liberty is more at stake. So there's that strong presumption, and just the absence of any need for constitutional ruling strongly supports this Court's rejection of government-compensated counsel in all of these cases. Thank you, Your Honor. Okay. I'm going to give the other side two minutes, and then I might ask if you want to say anything else, but don't tell me to tell. I mean, I'm just not following exact rules here. I'm just trying to get the arguments out. Thank you, Your Honor. There aren't any exact rules. Thank you very much, Your Honor. Just a few points. First, if the habeas provision of the PGA doesn't apply, there's another provision. It's called the catch-all provision, A1I, and that would apply here. That applies when an individual faces a loss of liberty in the case, and federal law requires the appointment of counsel. Here, the Supreme Court has said multiple times that deportation is a severe deprivation of liberty, in IMS v. St. Cyr and in Padilla v. Kentucky. Your Honor recognized that in her CJLG opinion, and here federal law would require the appointment of counsel either under the suspension clause analysis or under a balancing of the Matthew C. Eldridge factors under the due process clause. We asked you about due process, but I've never seen the ACLU not know the due process words, so it's not something that you ever write, so why should we even... Why should we make arguments for you? In all... So, Your Honor, we think the habeas analysis is very straightforward. We are... We're willing to provide supplemental briefing. I'm willing to argue it here. My understanding of all their original motions, they did mention the due process clause, but we think the habeas analysis is very straightforward because courts appointed counsel for individuals challenging their removal orders when they weren't challenging their detention in habeas in federal court, and it should apply here, too. If the CJA, the catch-all, or the habeas version doesn't apply, the All Writs Act applies. The Second Circuit, Zuma v. Cougar, makes clear that this court has authority under the All Writs Act to make orders necessary and sufficient in aid of its jurisdiction and in al oda, the district court in D.C., appointed counsel and compensated counsel under the All Writs Act. Finally, Judge Corman, to go back to your argument about standing, there's definitely standing to resolve the motions for appointment of counsel, which is what we're arguing, and then the compensation issue is right, and we do believe that there's not... I don't mean to take too much time, but whose motion, as I see it, you're making a motion for the lawyers because the petitioners have all been represented, and they have... That's my standing argument. I realize that you agree. I'm not saying that the lawyers are not agreed, but whose rights have been violated is what I was getting to. Yes, Your Honor, and maybe the suspension and due process clause, you know, now that their counsel has already been appointed, would be addressed, but there is still the compensation issue that is for the lawyers and is still right. And under that, the court has authority under the Criminal Justice Act or the All Writs Act. I just wanted to make one final point about the pro bono program. It cannot be adequate in these cases. All these individuals are not competent to represent themselves. They could not file not only their petition for reviews, they could not file the stays of removal. They would have been deported without any access to pro bono programs because this court can only appoint counsel under the pro bono program after a pro se individual first filed their petition for review, and that's why it can't be an adequate substitute here. And going back to the due process clause, it seems the government acknowledges that the Matthew V. Eldridge factors do apply and that if the court would balance those factors, I'm happy to provide supplemental briefing on the balancing of those factors or present that argument to the court right now. I recognize that I am. Unless there are any additional questions? All right. Thank you. Thank you both for your arguments. So now all of the aforementioned cases would be submitted.
judges: Fisher, Callahan, Korman